**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No: _____

CHESTER COUNTY EMPLOYEES' RETIREMENT FUND, Derivatively on Behalf of
Nominal Defendant ECHOSTAR CORP.,

       Plaintiff,

           v.

CHARLES W. ERGEN,
MICHAEL T. DUGAN,
R. STANTON DODGE,
TOM A. ORTOLF,
C. MICHAEL SCHROEDER,
ANTHONY M. FEDERICO,
PRADMAN P. KAUL,
JOSEPH P. CLAYTON,

       Defendants,

         and

ECHOSTAR CORP.,

       Nominal Defendant.

---

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT AND JURY DEMAND**

---

Plaintiff Chester County Employees' Retirement Fund ("Plaintiff"), by its undersigned attorneys, submits this Verified Shareholder Derivative Complaint against the defendants named herein, and alleges upon personal knowledge with respect to itself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, an investigation undertaken by Plaintiff's counsel, as to all other allegations herein, as follows:

## NATURE AND SUMMARY OF ACTION

1.      Plaintiff brings this action derivatively for the benefit of nominal defendant EchoStar Corp. ("EchoStar" or the "Company") against certain current and former members of its Board of Directors (the "Board") seeking to remedy defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment, federal statutory violations, and other violations of law that have caused EchoStar to sustain damages.

2.      In gross breach of their fiduciary duties as directors of the Company, the members of the Board's Compensation Committee (the "Compensation Committee") knowingly granted an award of stock options to EchoStar's Chairman of the Board ("Chairman") Charles W. Ergen ("Ergen") in deliberate violation of the Company's 2008 Stock Incentive Plan (as amended, the "2008 Plan," attached hereto as Exhibit A).

3.      The 2008 Plan allows the Compensation Committee to grant equity awards, including stock options, stock appreciation rights, restricted stock and restricted stock units, to executive officers and other key employees of the Company. While the Compensation Committee has been delegated the authority to make and approve equity awards to defendant Ergen under the 2008 Plan, its discretion in exercising such authority is not unlimited.  Rather, the 2008 Plan specifically prohibits the Compensation Committee from granting any one person more than 800,000 stock options in any calendar year (the "Limit").

4.      In blatant violation of the Limit, on March 31, 2011, the Compensation Committee, comprised at the time of defendants Tom A. Ortolf ("Ortolf"), C. Michael Schroeder ("Schroeder") and Joseph P. Clayton ("Clayton"), granted defendant Ergen 1,500,000 stock options, nearly double the Limit.  This award was *ultra vires* and a waste of EchoStar's assets

and constituted a flagrant breach of the Compensation Committee members' fiduciary duties owed to the Company and its shareholders.

5.      In addition to the foregoing, on March 23, 2012, the Board, as a further and separate breach of fiduciary duties and in violation of Section 14(a) of the Securities Exchange Act of 1934 ("Section 14(a)"), filed with the Securities and Exchange Commission ("SEC") and disseminated to EchoStar shareholders a Form DEF 14A proxy statement (the "2012 Proxy") containing false and misleading statements and omitting material information regarding the award of stock options to defendant Ergen in excess of the Limit.  The 2012 Proxy's failure to disclose that the March 31, 2011 stock option grant to defendant Ergen violated the 2008 Plan and false disclosure that the stock options were granted under the terms of the 2008 Plan were material misrepresentations in the solicitation of votes for the reelection of EchoStar's directors, including Compensation Committee members Ortolf and Schroeder, who granted the *ultra vires* award, and defendant Ergen, who received the *ultra vires* award.

6.      Through this derivative action, Plaintiff seeks to recover for the Company the damages caused by the misconduct alleged herein and to compel defendant Ergen to disgorge to the Company the improper benefits he received.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the allegations contained herein state a federal question relating to the submission and dissemination of a false proxy statement in violation of Section 14(a).  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(3), in that Plaintiff and Defendants are citizens of different states and, with respect to certain Defendants, of foreign states, and the matter in controversy exceeds $75,000.00, exclusive of interest and costs.  This Court has

supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States which it would not otherwise have.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because nominal defendant EchoStar is headquartered in this District.  In addition, a substantial portion of the occurrences complained of herein occurred in this District and one or more of the Defendants either resides in, or maintains offices in, this District.

## PARTIES

9.      Plaintiff is a shareholder of EchoStar, was a shareholder of EchoStar at the time of the wrongdoing alleged herein, and has been a shareholder of EchoStar continuously since that time.  Plaintiff is a citizen of the Commonwealth of Pennsylvania.

10.     Nominal defendant EchoStar is a Nevada corporation with its principal place of business located at 100 Inverness Terrace East, Englewood, Colorado, and thus is a citizen of Nevada and Colorado.  Shares of EchoStar's common stock are traded on NASDAQ under the ticker symbol "SATS."  According to its public filings, EchoStar is a holding company whose subsidiaries operate three segments: (i) EchoStar Technologies, which designs, develops and distributes digital set-top boxes and related products and technology, including Slingbox "placeshifting" technology, primarily for satellite TV service providers, telecommunication and cable companies; (ii) EchoStar Satellite Services, which uses 10 of the Company's 11 owned and leased in-orbit satellites and related FCC licenses to lease capacity on a full-time and occasional-use basis primarily to DISH Network Corporation ("DISH"), from which EchoStar was spun off in 2008 (the "Spin-Off"),  U.S. government service providers, state agencies, Internet service providers, broadcast news organizations, programmers and private enterprise customers; and (iii)

Hughes Communications, Inc. ("Hughes"), which was acquired by EchoStar on June 8, 2011, and provides satellite broadband Internet access to North American consumers and broadband network services and systems to the domestic and international enterprise markets.

11.     Defendant Ergen has served as Chairman of the Board since EchoStar's formation in 2007.  From 2007 until November 2009, he served as EchoStar's Chief Executive Officer ("CEO").  He serves as Executive Chairman and has been Chairman of the Board of Directors of DISH since its formation and, during the past five years, has held executive officer and director positions with DISH and its subsidiaries.  Along with his family members and related trusts, defendant Ergen beneficially owns approximately 50.6% of EchoStar's total equity and possesses approximately 75.6% of total voting power.  Similarly, defendant Ergen beneficially owns approximately 53.2% of the total equity of DISH and possesses approximately 90.4% of the total voting power of DISH.  On March 31, 2011, defendant Ergen received an award of 1,500,000 stock options, which exceeded the Limit and violated the 2008 Plan by 700,000 stock options.  Upon information and belief, defendant Ergen is a citizen of the State of Colorado.

12.     Defendant Michael T. Dugan ("Dugan") has served as CEO and President of EchoStar since November 2009 and has served as a director of the Company since 2007.  From January 1, 2008 until November 2009, he served as a Senior Advisor to EchoStar.  From May 2004 to December 2007, defendant Dugan was a director of DISH, and served DISH alternately as Chief Technical Officer and Senior Advisor from time to time.  Upon information and belief, defendant Dugan is a citizen of the State of Colorado.

13.     Defendant R. Stanton Dodge ("Dodge") has served as a director of EchoStar since 2009.  He is currently the Executive Vice President, General Counsel and Secretary of DISH, and is responsible for all legal and government affairs of DISH and its subsidiaries.  From

October 2007 to November 2011, defendant Dodge served as EchoStar's Executive Vice President, General Counsel and Secretary pursuant to a management services agreement between DISH and EchoStar that was entered into in connection with the Spin-Off.  Upon information and belief, defendant Dodge is a citizen of the State of Colorado.

14.     Defendant Ortolf has served as a director of EchoStar since 2007.  He has served as Chairman of the Compensation Committee since 2007 and granted and approved the *ultra vires* stock options award complained of herein.  Since 2007, defendant Ortolf has also served as a director of DISH and a member of its Executive Compensation Committee.  From 1988 until 1991, he served as President and Chief Operating Officer of DISH.  Upon information and belief, defendant Ortolf is a citizen of the State of Colorado.

15.     Defendant Schroeder has served as a director of EchoStar since 2007.  He has served on the Compensation Committee since 2007 and granted and approved the *ultra vires* stock options award complained of herein.  Upon information and belief, defendant Schroeder is a citizen of the State of Arizona.

16.     Defendant Anthony M. Federico ("Federico") has served as a director of EchoStar and as a member of the Compensation Committee since June 2011.  Defendant Federico was appointed to the Board and the Compensation Committee following the resignation of defendant Clayton effective June 20, 2011.  Upon information and belief, defendant Federico is a citizen of the State of New York.

17.     Defendant Pradman P. Kaul ("Kaul") has served as a director of EchoStar since August 2011.  He currently serves as the President of Hughes.  Upon information and belief, defendant Kaul is a citizen of the State of Maryland.

18.     Defendant Clayton served as a director of EchoStar from 2008 to June 20, 2011. He served on the Compensation Committee from 2008 until June 20, 2011 and granted and approved the *ultra vires* stock options award complained of herein.  Defendant Clayton resigned as a director of EchoStar on June 16, 2011, effective June 20, 2011, in order to devote more time to his new responsibilities as President and CEO of, and a member of the Board of Directors, of DISH.  Upon information and belief, defendant Clayton is a citizen of the State of Colorado.

19.     Defendants Ergen, Dugan, Dodge, Schroeder, Ortolf, Federico, Kaul and Clayton are referred to collectively herein as the "Individual Defendants."  Unless otherwise indicated, the term "Compensation Committee" refers to defendants Ortolf, Schroeder and Clayton.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

20.     By reason of their positions as officers and/or directors of EchoStar and because of their ability to control the business and corporate affairs of EchoStar, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of EchoStar and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of EchoStar owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

21.     To discharge their duties, the Individual Defendants, as officers and directors of the Company, were required to exercise reasonable and prudent supervision over the

management, policies, practices and controls of the Company.  By virtue of such duties, the

Individual Defendants were required to, among other things:

> a.  exercise good faith to ensure that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business;

> b.  exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules and regulations and requirements and the Company's governing documents, *e.g.*, the 2008 Plan, including acting only within the scope of their legal authority;

> c.  refrain from wasting the Company's assets or otherwise unduly benefiting themselves and other Company insiders at the expense of the Company; and

> d.  make full, fair, and accurate disclosures to shareholders.

22.  As set forth in the Company's proxy statements, the members of the

Compensation Committee make and approve grants of stock options and other equity-based

compensation to EchoStar's Named Executive Officers ("NEOs"), including defendant Ergen.

Specifically, the Compensation Committee members were and are required to comply with the

obligations set forth in the Executive Compensation Committee Charter, which provides that the

Compensation Committee members have the following duties and responsibilities:

> a.  Make and approve all option grants and other issuances of the Corporation's equity securities to the Corporation's executive officers and Board members other than nonemployee directors;

> b.  Approve all other option grants and issuances of the Corporation's equity securities, and recommend that the full Board make and approve such grants and issuances;

> c.  Establish in writing all performance goals for performance-based compensation, which together with other compensation to senior executive officers could exceed $1 million annually, other than standard Stock Incentive Plan options that may be paid to the Corporation's executive officers, and certify achievement of such goals prior to payment; and

      d.      Set the compensation of the Chairman and Chief Executive Officer.

23.    Additionally, the Individual Defendants, as well as all employees, officers and directors of EchoStar, were and are required to comply with the Company's Code of Ethics ("Code of Ethics").  According to the Code of Ethics, the Individual Defendants must "produce full, fair, accurate, timely and understandable disclosures in reports and documents…file[d] with or submit[ted] to the Securities and Exchange Commission" and "comply with applicable government laws, rules and regulations."

24.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

## SUBSTANTIVE ALLEGATIONS

25.    The 2008 Plan became effective on January 1, 2008 as a result of the Spin-Off. The stated purpose of the 2008 Plan is to "promote the interests of EchoStar…and its Subsidiaries by aiding the Company in attracting and retaining Participants capable of assuring the future success of the Company, to offer such personnel incentives to put forth maximum efforts for the success of the Company's business and to afford such personnel an opportunity to acquire a proprietary interest in the Company."

26.    The 2008 Plan provides for several types of equity awards, including (i) stock options; (ii) stock appreciation rights; (iii) restricted stock and restricted stock units; (iv) performance awards; (v) dividend equivalents; and (vi) other stock-based awards.

27.    According to the Compensation Committee Charter and the 2012 Proxy, the Compensation Committee makes and approves grants of stock options and other equity-based compensation to defendant Ergen and EchoStar's other NEOs.

28.     The 2008 Plan expressly limits the equity awards that may be granted thereunder and specifically provides that "during the term of the [2008] Plan…no Participant may be granted Awards…in the aggregate in respect of more than 800,000 Shares in any one calendar year."  The 2008 Plan defines "Award" as "Options, Stock Appreciation Rights, Restricted Stock, Restrict Stock Units, Performance Awards, Dividend Equivalents or Other Stock-Based Awards granted under the [2008] Plan."  Thus, an award of more than 800,000 stock options to any "Participant," which includes officers and directors, during a single calendar year necessarily violates the express terms of the 2008 Plan.

29.     Despite the Limit, the 2012 Proxy discloses that on March 31, 2011, "the Compensation Committee awarded Mr. Ergen an additional 1,500,000 stock options to ensure that he had appropriate incentives tied to the performance of EchoStar's Class A Shares."  The 2012 Proxy further states that the 1,500,000 stock options "were granted under the terms of EchoStar's 2008 Stock Incentive Plan."

30.     The March 31, 2011 award exceeded the Limit for calendar year 2011 by 700,000 options.  Thus, the Compensation Committee blatantly violated the 2008 Plan by making this improper and wasteful award.

31.     The Compensation Committee knew that the 2008 Plan limited stock option awards to 800,000 shares per person per year, yet they deliberately violated the Limit by granting and approving the excessive, wasteful and *ultra vires* award to defendant Ergen.

32.     Awards of compensation to EchoStar officers are entitled to tax deductibility pursuant to section 162(m) of the Internal Revenue Code only if the awards comply with the terms of the shareholder-approved 2008 Plan. By violating the Limit, the Compensation Committee put at risk the tax deductibility of the stock options awarded to defendant Ergen.

33.     Notwithstanding the clear violation of the 2008 Plan, nowhere in the 2012 Proxy (nor in any other public filing) does the Board or the Compensation Committee disclose that the Compensation Committee violated the 2008 Plan and that the violation put at risk the tax deductibility of the award to defendant Ergen.

34.     EchoStar stockholders are entitled to rely on the truth of representations made in the proxy materials relating to executive compensation. The Board had control over the statements made in annual proxy materials sent to EchoStar stockholders and had actual knowledge of statements made in those proxy materials.

35.     The 2012 Proxy failed to disclose that the March 31, 2011 award to defendant Ergen violated the shareholder-approved 2008 Plan and that the violation put at risk the tax deductibility of the award to defendant Ergen.  In particular, the 2012 Proxy was false and misleading because it falsely stated that the 1,500,000 stock options awarded to defendant Ergen on March 31, 2011 were granted under the terms of the 2008 Plan when in fact the award violated the terms of the 2008 Plan.  Specifically, the 2012 Proxy falsely states that "all awards in this table (*e.g.*, the 1,500,000 stock options granted to defendant Ergen) were made in shares of EchoStar common stock and were granted under the terms of EchoStar's 2008 Stock Incentive Plan."

36.     The 2012 Proxy contained material misstatements and omissions of material fact concerning the stock options award to defendant Ergen.  Accordingly, the 2012 Proxy was materially false and misleading and unlawfully deprived EchoStar stockholders of their right to cast a fully informed vote at the annual meeting, especially with respect to the reelection of defendants Ortolf and Schroeder, who granted the *ultra vires* award, and defendant Ergen, who received the *ultra vires* award.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

37.     The Compensation Committee exceeded the bounds of the law and legitimate business judgment by granting and approving stock options in excess of the Limit, thereby violating the 2008 Plan.

38.     Defendants Ergen, Dugan, Dodge, Ortolf, Schroeder, Federico and Kaul, as members of the Board, knowingly caused and allowed the Company to file the 2012 Proxy, which contained materially false and misleading statements and omissions, as alleged herein.

39.     The foregoing misconduct was unjustifiable and constituted a gross breach of these Individual Defendants' fiduciary duties as directors of the Company. The foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit defendant Ergen at the expense of the Company.

40.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained damages, including, but not limited to, the value of the *ultra vires* stock options awarded to defendant Ergen in violation of the 2008 Plan.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

41.     Plaintiff brings this action derivatively and in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, federal statutory violations and unjust enrichment.

42.     Plaintiff is a shareholder of EchoStar, was a shareholder of EchoStar at the time of the wrongdoing alleged herein, and has been a shareholder of EchoStar continuously since that time.

43.     Plaintiff will adequately and fairly represent the interests of the Company and its

shareholders in enforcing and prosecuting its rights.

44.     As a result of the facts set forth herein, Plaintiff has not made any demand on the

Board to institute this action against the Individual Defendants.  Such a demand would be a futile

and useless act because the Board is incapable of making an independent and disinterested

decision to institute and vigorously prosecute this action.

45.     The Board currently consists of seven directors: defendants Ergen, Dugan, Dodge,

Ortolf, Schroeder, Federico and Kaul.  The following directors are incapable of independently

and disinterestedly considering a demand to vigorously prosecute this action:

a.      Defendants Ortolf and Schroeder, because they granted the *ultra vires* award of stock options to defendant Ergen in violation of the Limit, which was not the product of a valid exercise of business judgment, was a waste of EchoStar's assets and for which they face a substantial likelihood of liability;

b.      Defendant Ergen, because he is directly interested in his *ultra vires* award of stock options in violation of the 2008 Plan;

c.      Defendants Dugan and Dodge, because they are not independent of defendant Ergen as a result of Ergen's control of EchoStar and DISH. Specifically, (i) defendant Ergen recommends to the Board Dugan's compensation as CEO and President of EchoStar, which is his principal means of earning a living; (ii) Dugan was a director of DISH, which is controlled by defendant Ergen, and served DISH alternately as Chief Technical Officer and Senior Advisor from time to time; and (iii) defendant Dodge is currently the Executive Vice President, General Counsel and Secretary of DISH and in that position, which is his principal means of earning a living, he reports to, and his compensation is in part determined by, defendant Ergen, who serves as Executive Chairman of DISH;

d.      Defendants Ergen, Dugan, Dodge and Kaul, because, as disclosed in EchoStar's SEC filings, the Company does not consider them to be independent pursuant to the listing standards of the NYSE; and

e.      Defendants Ergen, Dugan, Dodge, Ortolf, Schroeder, Federico and Kaul (*i.e.*, the entire Board), because they approved and disseminated the false

and misleading 2012 Proxy, which is likewise not protected by the business judgment rule and subjects all of the foregoing directors to a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith and violating Section 14(a).

46.     Demand is also excused because the misconduct complained of herein was not, and could not have been, the product of a good faith exercise of business judgment.  On the contrary, defendants engaged in *ultra vires* conduct that is not and cannot be protected by the business judgment rule.

## COUNT I

**Against Defendants Ortolf, Schroeder and Clayton for Breach of Fiduciary Duties of Loyalty and Good Faith in Connection with Violating the 2008 Plan**

47.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

48.     As alleged in detail herein, each of the Individual Defendants, by reason of their positions as fiduciaries of the Company, owed to the Company the duties of undivided loyalty and good faith, and had a fiduciary duty to, among other things, exercise in good faith in ensuring that the Company complied with all applicable federal and state laws, rules, regulations and requirements and the Company's governing documents, *e.g.*, the 2008 Plan, including acting only within the scope of their legal authority.

49.     Defendants Ortolf, Schroeder and Clayton breached their fiduciary duties of loyalty and good faith by granting defendant Ergen stock options in excess of the Limit and in deliberate violation of the 2008 Plan, as alleged herein.

50.     The Company was damaged as a direct and proximate result of defendants Ortolf, Schroeder and Clayton's foregoing breaches of fiduciary duties, as alleged herein.

## COUNT II

### Against Defendants Ortolf, Schroeder and Clayton for Waste of Corporate Assets

51.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

52.     Defendants Ortolf, Schroeder and Clayton, as members of the Compensation Committee on March 31, 2011, had a duty to ensure that their compensation decisions did not create an unwarranted risk of non-compliance with the law and the Company's governing documents.   Nevertheless, fully aware of the Limit, they granted stock options to defendant Ergen in excess thereof and in violation of the 2008 Plan.

53.     Defendants Ortolf, Schroeder and Clayton wasted corporate assets in the form of *ultra vires* stock options granted to defendant Ergen, as alleged herein.

54.     As a direct and proximate result of the foregoing waste of corporate assets, the Company has sustained damaged, as alleged herein.

## COUNT III

### Against Defendants Ergen, Dugan, Dodge, Ortolf, Schroeder, Federico and Kaul for Breaches of Fiduciary Duties for Disseminating False and Misleading Statements

55.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

56.     As alleged in detail herein, defendants Ergen, Dugan, Dodge, Ortolf, Schroeder, Federico and Kaul owed the Company the fiduciary duties of loyalty, good faith, and candor.

57.     Defendants Ergen, Dugan, Dodge, Ortolf, Schroeder, Federico and Kaul breached their fiduciary duties of loyalty, good faith, and candor by disseminating the 2012 Proxy, which they knew contained false and misleading statements and omissions, as alleged herein.

58.     As a direct and proximate result of the foregoing breaches of fiduciary duties, the Company is entitled to equitable and injunctive relief, including, but not limited to, an order invalidating the shareholder vote on the election of defendants Ergen, Dugan, Dodge, Ortolf, Schroeder, Federico and Kaul.

## COUNT IV

### Against Defendants Ergen, Dugan, Dodge, Ortolf, Schroeder, Federico and Kaul for Violation of Section 14(a) of the Securities Exchange Act

59.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

60.     Rule 14-A-9, promulgated pursuant to Section 14(a), provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14-A-9.

61.     The 2012 Proxy violated Section 14(a) and Rule 14-A-9 because it contained false and misleading statements because it falsely stated that the 1,500,000 stock options awarded to defendant Ergen on March 31, 2011 were granted under the terms of the 2008 Plan and omitted material information necessary in order to make the statements therein not false or misleading, specifically, that the 2008 Plan limited stock options awards to 800,000 shares per person per calendar year and the March 31, 2011 stock options award to defendant Ergen violated the Limit.

62.     The misrepresentations and omissions in the 2012 Proxy were material and were an essential link in the reelection of defendants Ortolf and Schroeder, who granted the *ultra vires* award, and defendant Ergen, who received the *ultra vires* award.

63.    As a direct and proximate result of the foregoing statutory violations, the Company is entitled to equitable and injunctive relief, including, but not limited to, an order invalidating the shareholder vote on the election of defendants Ergen, Dugan, Dodge, Ortolf, Schroeder, Federico and Kaul.

## COUNT V

### Against Defendant Ergen for Unjust Enrichment

64.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

65.    Defendant Ergen received an excessive and unwarranted grant of stock options in excess of the Limit and in violation of the 2008 Plan, as alleged herein.

66.    It would be unconscionable and against the fundamental principles of justice, equity and good conscience for defendant Ergen to retain the excessive, unwarranted and *ultra vires* stock options he has received in violation of the 2008 Plan.

67.    To remedy defendant Ergen's unjust enrichment, the Court should enter an order compelling him to disgorge to the Company the stock options he has received in violation of the 2008 Plan, as well as any proceeds he has derived therefrom.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

a.    Awarding the Company the amount of damages it sustained as a result of the Individual Defendants' breaches of fiduciary duties and waste of corporate assets;

b.    Ordering defendant Ergen to disgorge to the Company the stock options he received in violation of the 2008 Plan, as well as any proceeds he has derived therefrom;

c.     Granting appropriate equitable and injunctive relief to remedy the Individual Defendants' breaches of fiduciary duties and statutory violations;

d.     Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

e.     Granting such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: December 18, 2012                    **THE SHUMAN LAW FIRM**

s/ Kip B. Shuman
Kip B. Shuman
Rusty E. Glenn
885 Arapahoe Avenue
Boulder, CO 80302
Telephone: (303) 861-3003
Facsimile: (303) 484-4886
Email: kip@shumanlawfirm.com
Email: Rusty@shumanlawfirm.com

**KESSLER TOPAZ
   MELTZER & CHECK, LLP**
Eric L. Zagar
Robin Winchester
Matthew A. Goldstein
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Fax:  (267) 948-2512

*Attorneys for Plaintiff*

## **VERIFICATION**

I, Mark J. Rupsis, as Chief Operating Officer of the County of Chester, hereby verify that I have been directed by the Chester County Employees' Retirement Fund Board to authorize the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: 12/17/12

Mark J. Rupsis, Chief Operating Officer
Chester County Employees' Retirement Fund

Exhibit A

Table of Contents

**Appendix B**
AMENDED AND RESTATED
ECHOSTAR CORPORATION
2008 STOCK INCENTIVE PLAN

Section 1. Purpose

The purpose of this Stock Incentive Plan (the "Plan") is to promote the interests of EchoStar Corporation (the "Company") and its Subsidiaries by aiding the Company in attracting and retaining Participants capable of assuring the future success of the Company, to offer such personnel incentives to put forth maximum efforts for the success of the Company's business and to afford such personnel an opportunity to acquire a proprietary interest in the Company.

Section 2. Definitions

As used in the Plan, the following terms shall have the meanings set forth below:

(a) "Award" shall mean an award granted to a Participant in accordance with the terms of this Plan in the form of Options, Stock Appreciation Rights, Restricted Stock, Restricted Stock Units, Performance Awards, Dividend Equivalents or Other Stock–Based Awards granted under the Plan, or any combination of the foregoing.

(b) "Award Agreement" shall mean any written agreement, contract or other instrument or document evidencing any Award granted under the Plan.

(c) "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and any regulations promulgated thereunder.

(d) "Committee" shall mean the committee described in Section 3 of the Plan.

(e) "Company" shall mean EchoStar Corporation, a Nevada corporation, and any successor corporation.

(f) "Dividend Equivalent" shall mean any right granted under Section 6(e) of the Plan.

(g) "DISH" shall mean DISH Network Corporation, a Nevada corporation, and any successor corporation.

(h) "Employee Matters Agreement" shall mean the agreement entered into by the Company and DISH as of January 1, 2008.

(i) "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

(j) "Exchange Program" means a program under which (i) outstanding Awards are surrendered or cancelled in exchange for Awards of the same type (which may have lower exercise prices and different terms), Awards of a different type, and/or cash, and/or (ii) the exercise price of an outstanding Award is reduced. The terms and conditions of any Exchange Program will be determined by the Committee in its sole discretion and shall not require separate approval by the Company's shareholders.

(k) "Key Employee" shall mean any person, including officers and directors, in the regular full–time employment of the Company or a Subsidiary who, in the opinion of the Committee, is, or is expected to be, primarily responsible for the management, growth or protection of some part or all of the business of the Company and its Subsidiaries or otherwise to contribute substantially to the success of the Company and its Subsidiaries.

(l) "Fair Market Value" shall mean, with respect to Shares, the final closing price, as quoted by the National Association of Securities Dealers Automated Quotation System ("NASDAQ") or any other exchange on which the Shares are traded, for the date in question. If Fair Market Value is in reference to property other than Shares, the Fair

50

**Table of Contents**

Market Value of such other property shall be determined by such methods or procedures as shall be established from time to time by the Committee.

(m) "Incentive Stock Option" shall mean an option granted under Section 6(a) of the Plan that is intended to meet the requirements of Section 422 of the Code or any successor provision.

(n) "Non–employee Director" shall mean a director of the Company who is a "non–employee director" within the meaning of Rule 16b–3.

(o) "Non–Qualified Stock Option" shall mean an option granted under Section 6(a) of the Plan that is not intended to be an Incentive Stock Option.

(p) "Option" shall mean an Incentive Stock Option or a Non–Qualified Stock Option, and shall include Restoration Options.

(q) "Other Stock–Based Award" shall mean any right granted under Section 6(f) of the Plan.

(r) "Outside Director" shall mean a director of the Company who is an "outside director" within the meaning of Section 162(m) of the Code.

(s) "Participant" shall mean (1) any Key Employee designated to be granted an Award under the Plan by the Committee, (2) a consultant or advisor currently providing services to the Company or Subsidiary (by contract or otherwise) designated to be granted an Award under the Plan by the Committee, or (3) any employee of the Company or Subsidiary designated to be granted an Award under the Plan by the Committee if such grant is part of a broad–based performance incentive program. In addition, in connection with the spin–off of the Company, certain current and former employees and consultants and advisors of DISH will be considered Participants in connection with their receipt of Replacement and Substitute Awards.

(t) "Performance Award" shall mean any right granted under Section 6(d) of the Plan.

(u) "Person" shall mean any individual, corporation, partnership, association or trust.

(v) "Plan" shall mean this 2008 Stock Incentive Plan, as amended from time to time.

(w) "Replacement and Substitute Award" shall mean an Option or Restricted Stock Unit granted in connection with the spin–off of the Company to certain current and former employees and consultants and advisors of DISH pursuant to the terms of the Employee Matters Agreement.

(x) "Restoration Option" shall mean any Option granted under Section 6(a)(iv) of the Plan which confers upon the Participant the right to receive a new Option upon the payment of the exercise price of a previously held Option by delivery of previously owned Shares.

(y) "Restricted Stock" shall mean any Share granted under Section 6(c) of the Plan, subject to such restrictions as the Committee deems appropriate or desirable.

(z) "Restricted Stock Unit" shall mean any unit granted under Section 6(c) of the Plan evidencing the right to receive a Share (or a cash payment equal to the Fair Market Value of a Share) at some future date.

(aa) "Retirement" shall mean becoming eligible to receive immediate retirement benefits under a retirement or pension plan of the Company or any Subsidiary.

(bb) "Rule 16b–3" shall mean Rule 16b–3 promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended, or any successor rule or regulation.

51

Table of Contents

 (cc) "Shares" shall mean shares of Class A Common Stock, $0.001 par value, of the Company or such other securities or property as may become subject to Awards pursuant to an adjustment made under Section 4(c) of the Plan.

 (dd) "Stock Appreciation Right" shall mean any right granted under Section 6(b) of the Plan.

 (ee) "Subsidiary" shall mean any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if each of the corporations other than the last corporation in the unbroken chain owns 50% or more of the voting stock or other equity interests in one of the other corporations in such chain.

 (ff) "Ten−Percent Stockholder" shall mean an individual who owns (within the meaning of Section 422(b)(6) of the Code) stock possessing more than 10% of the total combined voting power of all classes of stock of the Company or of a Subsidiary.

 (gg) "Total Disability" shall mean the complete and permanent inability of an employee Participant to perform such Participant's duties under the terms of the Participant's employment with the Company or any Subsidiary, as determined by the Committee upon the basis of such evidence, including independent medical reports and data, as the Committee deems appropriate or necessary.

Section 3. Administration.

 (a) Power and Authority of the Committee.

  (i) *The Committee.* The Committee shall consist of at least two directors of the Company and may consist of the entire Board of Directors; *provided, however*, that (i) if the Committee consists of less than the entire Board of Directors, each member shall be a Non−employee Director and (ii) to the extent necessary for any Award intended to qualify as performance−based compensation under Section 162(m) of the Code, to so qualify, each member of the Committee, whether or not it consists of the entire Board of Directors, shall be an Outside Director. The Committee may determine the extent to which any Option under the Plan is required to comply, or not comply, with Section 409A of the Code.

  (ii) *Power and Authority.* Subject to the express provisions of the Plan and to applicable law, the Committee shall have full power and authority to: (i) designate Participants; (ii) determine the type or types of Awards to be granted to each Participant under the Plan; (iii) determine the number of Shares to be covered by (or with respect to which payments, rights or other matters are to be calculated in connection with) each Award; (iv) determine the terms and conditions of any Award or Award Agreement which may be based on various factors such as length of employment and/or performance of the Participant or the Company (such performance criteria may include but are not limited to Company's achievement of specified financial or other performance metrics, such as subscriber growth (for clarification purposes, with respect to Section 162(m) of the Code, such performance criteria are intended to include any one or a combination of the business criteria set forth on Exhibit A)); (v) amend the terms and conditions of any Award or Award Agreement and accelerate the exercisability of Options or the lapse of restrictions relating to Restricted Stock, Restricted Stock Units or other Awards; (vi) determine whether, to what extent and under what circumstances Awards may be exercised in cash, Shares, other securities, other Awards or other property, or canceled, forfeited or suspended; (vii) determine whether, to what extent and under what circumstances cash, Shares, other securities, other Awards, other property and other amounts payable with respect to an Award under the Plan shall be deferred either automatically or at the election of the holder thereof or the Committee; (viii) interpret and administer the Plan and any instrument or agreement relating to, or Award made under, the Plan; (ix) establish, amend, suspend or waive such rules and regulations and appoint such agents as it shall deem appropriate for the proper administration of the Plan; (x) institute one or more Exchange Programs, including without limitation any Exchange Program described in Section 9(b); and (xi) make any other determination and take any other action that the Committee deems necessary or desirable for the administration of the Plan. The Committee's selection of a person to participate in this Plan at any time shall not require the Committee to select such person to participate in this Plan at any other time. Unless otherwise expressly provided in the Plan, all designations, determinations, interpretations and other decisions under or with respect to the Plan or any Award shall be within the sole discretion of the Committee, may be made at any time and shall be final, conclusive and binding upon any Participant, any holder or beneficiary of any Award and any employee of the Company or any Subsidiary. The Committee's decisions and determinations under the Plan need not be uniform and may be made selectively among Participants, whether or not such Participants are similarly situated.

Table of Contents

(b) Delegation. The Committee may, in its sole discretion, delegate such powers and duties under the Plan as it deems appropriate; *provided, however,* that the Committee shall not delegate its powers and duties under the Plan with regard to executive officers or directors of the Company or any Subsidiary who are subject to Section 16 of the Exchange Act.

(c) Replacement and Substitute Awards. In exercising its power and authority hereunder with respect to Replacement and Substitute Awards held by current and former employees and directors of DISH (and their respective transferees), the Committee shall (i) act in good faith and (ii) cooperate with and give due regard to any information provided by DISH. In addition, with respect to such Replacement and Substitute Awards, the Company shall not, without the prior written consent of the DISH Compensation Committee, take any discretionary action to accelerate vesting of any such awards.

Section 4. Shares Available for Awards.

(a) Shares Available. Subject to adjustment as provided in Section 4(c), the number of Shares that may be issued subject to Awards under the Plan shall not exceed 16,000,000 (for clarification purposes, this limitation applies to Incentive Stock Options); *provided, however,* that during the term of the Plan (i) no Participant may be granted Awards (other than Awards described in clause (ii) below) in the aggregate in respect of more than 800,000 Shares in any one calendar year (for clarification purposes, this limitation applies to Options and Stock Appreciation Rights) and (ii) the maximum amount that any Participant may receive in any one calendar year in respect of Performance Awards granted pursuant to Section 6(d) may not exceed the Fair Market Value of 400,000 Shares (for clarification purposes, to the extent such award is intended to qualify as "performance–based compensation" within the meaning of Section 162(m) of the Code, the maximum amount that such Participant may receive in any one calendar year may not exceed $30,000,000). Shares to be issued under the Plan may be either Shares reacquired and held in the treasury or authorized but unissued Shares. If any Shares covered by an Award or to which an Award relates are not purchased or are forfeited, or if an Award otherwise terminates without delivery of any Shares, then the number of Shares counted against the aggregate number of Shares available under the Plan with respect to such Award, to the extent of any such forfeiture or termination, shall again be available for granting Awards under the Plan. The Company shall at all times keep available out of authorized but unissued and/or reacquired Shares the number of Shares to satisfy Awards granted under the Plan.

(b) Accounting for Awards. For purposes of this Section 4, if an Award entitles the holder thereof to receive or purchase Shares, the number of Shares covered by such Award or to which such Award relates shall be counted on the date of grant of such Award against the aggregate number of Shares available under Section 4(a) above for granting Awards under the Plan.

(c) Adjustments. In the event that the Committee shall determine that any dividend or other distribution (whether in the form of cash, Shares, other securities or other property), recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split–up, spin–off, combination, repurchase or exchange of Shares or other securities of the Company, issuance of warrants or other rights to purchase Shares or other securities of the Company or other similar corporate transaction or event affects the Shares such that an adjustment is determined by the Committee to be appropriate in order to prevent dilution or enlargement of the benefits or potential benefits intended to be made available under the Plan, then the Committee shall, in such manner as it may deem equitable, adjust any or all of (i) the number and type of Shares (or other securities or other property) which thereafter may be made the subject of Awards, (ii) the number and type of Shares (or other securities or other property) subject to outstanding Awards and (iii) the purchase or exercise price with respect to any Award; *provided, however,* that the number of Shares covered by any Award or to which such Award relates shall always be a whole number.

Section 5. Eligibility of Key Employees.

Any Key Employee, including any Key Employee who is an officer or director of the Company or any Subsidiary, shall be eligible to be designated a Participant; *provided, however,* a director of the Company who is not also an employee of the Company or a Subsidiary shall not be designated as a Participant. In determining which Key Employees shall receive an Award and the terms of any Award, the Committee may take into account the nature of the services rendered by the respective Key Employees, their present and potential contributions to the success of the Company or such other factors as the Committee, in its sole discretion, shall deem relevant. Notwithstanding the foregoing, an

53

Table of Contents

Incentive Stock Option may only be granted to full or part–time employees (which term as used herein includes, without limitation, officers and directors who are also employees) of the Company and its Subsidiaries.

Section 6. Awards.

(a) Options. The Committee is hereby authorized to grant Options to Participants with the following terms and conditions and with such additional terms and conditions not inconsistent with the provisions of the Plan as the Committee shall determine, which terms and conditions shall be set forth in a form approved by the Committee.

(i) Exercise Price. The exercise price per Share purchasable under an Option shall be determined by the Committee; provided, however, that, the exercise price of an Option shall not be less than 100% of the Fair Market Value of a Share on the date of grant of such Option (110% in the case of an Incentive Stock Option granted to a Ten–Percent Stockholder); provided, further, that the aggregate Fair Market Value, determined at the time an Incentive Stock Option is granted, of the Shares with respect to which Incentive Stock Options may be exercisable for the first time by an employee Participant in any calendar year under all plans of the Company and any parent corporation of the Company and any Subsidiary shall not exceed $100,000.

(ii) Option Term. The term of each Option shall be for a period of ten years from the date of grant of any Incentive Stock Option (5 years in the case of an Incentive Stock Option granted to a Ten–Percent Stockholder) and ten years and three months from the date of grant of a Non–Qualified Stock Option, unless an earlier expiration date shall be stated in the Option or the Option shall cease to be exercisable pursuant to this Section 6. If an employee Participant's employment with the Company and all Subsidiaries terminates other than by reason of such Participant's death, Total Disability or Retirement, the Participant's Option shall terminate and cease to be exercisable upon termination of employment, unless the Committee shall determine otherwise.

(iii) Time and Method of Exercise. The Committee shall determine the time or times at which an Option may be exercised in whole or in part and the method or methods by which, and the form or forms (including, without limitation, cash, Shares, promissory notes, other securities, other Awards or other property, or any combination thereof, having a Fair Market Value on the exercise date equal to the relevant exercise price) in which, payment of the exercise price with respect thereto may be made or deemed to have been made. The Committee may also permit the holders of Options, in accordance with such procedures as the Committee may in its sole discretion establish, including those set forth in Section 6(g) hereof, to exercise Options and sell Shares acquired pursuant to a brokerage or similar arrangement approved in advance by the Committee, and to use the proceeds from such sale as payment of the exercise price of such Options.

(iv) Restoration Options. The Committee may grant Restoration Options, separately or together with another Option, pursuant to which, subject to the terms and conditions established by the Committee and any applicable requirements of Rule 16b–3 or any other applicable law, the Participant would be granted a new Option when the payment of the exercise price of the Option to which such Restoration Option relates is made by the delivery of Shares owned by the Participant pursuant to the relevant provisions of the Plan or agreement relating to such Option, which new Option would be an Option to purchase the number of Shares not exceeding the sum of (A) the number of Shares so provided as consideration upon the exercise of the previously granted Option to which such Restoration Option relates and (B) the number of Shares, if any, tendered or withheld as payment of the amount to be withheld under applicable tax laws in connection with the exercise of the Option to which such Restoration Option relates pursuant to the relevant provisions of the Plan or agreement relating to such Option. Restoration Options may be granted with respect to Options previously granted under the Plan or any other stock option plan of the Company, and may be granted in connection with any Option granted under the Plan or any other stock option plan of the Company at the time of such grant; provided, however, that Restoration Options may not be granted with respect to any Option granted to a Non–employee Director under any other stock option plan of the Company.

(v) Incentive and Non–Qualified Stock Options. Each Option granted pursuant to the Plan shall specify whether it is an Incentive Stock Option or a Non–Qualified Stock Option, provided that the Committee may in the case of the grant of an Incentive Stock Option give the Participant the right to receive in its place a Non–Qualified Stock Option.

54

Table of Contents

(b) <u>Stock Appreciation Rights</u>. The Committee is hereby authorized to grant Stock Appreciation Rights to Participants subject to the terms of the Plan and any applicable Award Agreement. A Stock Appreciation Right granted under the Plan shall confer on the holder thereof a right to receive upon exercise thereof the excess of (i) the Fair Market Value of one Share on the date of exercise (or, if the Committee shall so determine, at any time during a specified period before or after the date of exercise) over (ii) the grant price of the Stock Appreciation Right as specified by the Committee, which price shall not be less than 100% of the Fair Market Value of one Share on the date of grant of the Stock Appreciation Right. Subject to the terms of the Plan and any applicable Award Agreement, the grant price, term, methods of exercise, dates of exercise, methods of settlement and any other terms and conditions of any Stock Appreciation Right shall be as determined by the Committee. The Committee may impose such conditions or restrictions on the exercise of any Stock Appreciation Right as it may deem appropriate.

(c) <u>Restricted Stock and Restricted Stock Units</u>. The Committee is hereby authorized to grant Awards of Restricted Stock and Restricted Stock Units to Participants with the following terms and conditions and with such additional terms and conditions not inconsistent with the provisions of the Plan as the Committee shall determine:

(i) *Restrictions*. Shares of Restricted Stock and Restricted Stock Units shall be subject to such restrictions as the Committee may impose (including, without limitation, any limitation on the right to vote a Share of Restricted Stock or the right to receive any dividend or other right or property with respect thereto), which restrictions may lapse separately or in combination at such time or times, in such installments or otherwise as the Committee may deem appropriate (the "Restricted Period").

(ii) *Stock Certificates*. Any Restricted Stock granted under the Plan shall be evidenced by issuance of a stock certificate or certificates, which certificate or certificates shall be held by the Company. Such certificate or certificates shall be registered in the name of the Participant and shall bear an appropriate legend referring to the terms, conditions and restrictions applicable to such Restricted Stock. Except as otherwise provided in this Section 6(c), no Shares of Restricted Stock received by a Participant shall be sold, exchanged, transferred, pledged, hypothecated or otherwise disposed of during the Restricted Period. In the case of Restricted Stock Units, no Shares shall be issued at the time such Awards are granted.

(iii) *Forfeiture; Delivery of Shares*. Except as otherwise determined by the Committee, upon termination of a Participant's employment (as determined under criteria established by the Committee) during the applicable Restricted Period, all Shares of Restricted Stock and all Restricted Stock Units held by such Participant at such time subject to restriction shall be forfeited and reacquired by the Company; *provided, however*, that in the cases of death, Total Disability or Retirement, or in circumstances where the Committee finds that a waiver would be in the best interest of the Company, the Committee may waive in whole or in part any or all remaining restrictions with respect to Shares of Restricted Stock or Restricted Stock Units. Any Share representing Restricted Stock that is no longer subject to restrictions shall be delivered to the holder thereof promptly after the applicable restrictions lapse or are waived. Upon the lapse or waiver of restrictions and the restricted period relating to Restricted Stock Units evidencing the right to receive Shares, such Shares shall be issued and delivered to the holders of the Restricted Stock Units.

(d) <u>Performance Awards</u>. The Committee is hereby authorized to grant Performance Awards to Participants subject to the terms of the Plan and any applicable Award Agreement. A Performance Award granted under the Plan (i) may be denominated or payable in cash, Shares (including, without limitation, Restricted Stock), other securities, other Awards or other property and (ii) shall confer on the holder thereof the right to receive payments, in whole or in part, upon the achievement of such performance goals during such performance periods as the Committee shall establish. Subject to the terms of the Plan and any applicable Award Agreement, the performance goals to be achieved during any performance period, the length of any performance period, the amount of any Performance Award granted, the amount of any payment or transfer to be made pursuant to any Performance Award and any other terms and conditions of any Performance Award shall be determined by the Committee.

(e) <u>Dividend Equivalents</u>. The Committee is hereby authorized to grant to Participants Dividend Equivalents under which such Participants shall be entitled to receive payments (in cash, Shares, other securities, other Awards or other property as determined in the discretion of the Committee) equivalent to the amount of cash dividends paid by the Company to holders of Shares with respect to a number of Shares determined by the Committee. Subject to the terms of the Plan and any applicable Award Agreement, such Dividend Equivalents may have such terms and conditions as the Committee shall determine.

Table of Contents

(f) <u>Other Stock–Based Awards</u>. The Committee is hereby authorized to grant to Participants such other Awards that are denominated or payable in, valued in whole or in part by reference to, or otherwise based on or related to, Shares (including, without limitation, securities convertible into Shares), as are deemed by the Committee to be consistent with the purpose of the Plan; *provided, however,* that such grants must comply with applicable law and, in the case of executive officers and directors of the Company, Rule 16b–3. Subject to the terms of the Plan and any applicable Award Agreement, the Committee shall determine the terms and conditions of such Awards. Shares or other securities delivered pursuant to a purchase right granted under this Section 6(f) shall be purchased for such consideration, which may be paid by such method or methods and in such form or forms (including without limitation, cash, Shares, promissory notes, other securities, other Awards or other property or any combination thereof), as the Committee shall determine, the value of which consideration, as established by the Committee, shall not be less than 100% of the Fair Market Value of such Shares or other securities as of the date such purchase right is granted.

(g) <u>General</u>.

(i) *No Cash Consideration for Awards*. Awards shall be granted for no cash consideration or for such minimal cash consideration as may be required by applicable law.

(ii) *Awards May Be Granted Separately or Together*. Awards may, in the discretion of the Committee, be granted either alone or in addition to, in tandem with, or in substitution for, any other Award or any award granted under any plan of the Company or any Subsidiary other than the Plan. Awards granted in addition to or in tandem with other Awards or in addition to or in tandem with awards granted under any such other plan of the Company or any Subsidiary may be granted either at the same time as, or at a different time from, the grant of such other Awards or awards.

(iii) *Forms of Payment under Awards*. Subject to the terms of the Plan and of any applicable Award Agreement, payments or transfers to be made by the Company or a Subsidiary upon the grant, exercise or payment of an Award may be made in such form or forms as the Committee shall determine (including, without limitation, cash, Shares, promissory notes, other securities, other Awards or other property or any combination thereof), and may be made in a single payment or transfer, in installments or on a deferred basis, in each case in accordance with rules and procedures established by the Committee. Such rules and procedures may include, without limitation, provisions for the payment or crediting of reasonable interest on installment or deferred payments or the grant or crediting of Dividend Equivalents with respect to installment or deferred payments.

(iv) *Cashless Exercise*. Options may be exercised in whole or in part upon delivery to the Secretary of the Company of an irrevocable written notice of exercise. The date on which such notice is received by the Secretary shall be the date of exercise of the Option, provided that within three business days of the delivery of such notice the funds to pay for exercise of the Option are delivered to the Company by a broker acting on behalf of the optionee either in connection with the sale of the Shares underlying the Option or in connection with the making of a margin loan to the optionee to enable payment of the exercise price of the Option. In connection with the foregoing, the Company will provide a copy of the notice of exercise of the Option to the aforesaid broker upon receipt by the Secretary of such notice and will deliver to such broker, within three business days of the delivery of such notice to the Company, a certificate or certificates (as requested by the broker) representing the number of Shares underlying the Option that have been sold by such broker for the optionee.

(v) *Limits on Transfer of Awards*. No Award and no right under any such Award shall be transferable by a Participant otherwise than by will, the laws of descent and distribution or pursuant to a qualified domestic relations order as defined by the Code; *provided, however*, that, if so determined by the Committee, a Participant may, in the manner established by the Committee, designate a beneficiary or beneficiaries to exercise the rights of the Participant and receive any property distributable with respect to any Award upon the death of the Participant. Each Award or right under any Award shall be exercisable during the Participant's lifetime only by the Participant or, if permissible under applicable law, by the Participant's guardian or legal representative. No Award or right under any such Award may be pledged, alienated, attached or otherwise encumbered, and any purported pledge, alienation, attachment or encumbrance thereof shall be void and unenforceable against the Company or any Subsidiary.

(vi) *Term of Awards*. Unless otherwise expressly set forth in the Plan, the term of each Award shall be for such period as may be determined by the Committee.

56

Table of Contents

(vii) *Restrictions; Securities Listing*. All certificates for Shares or other securities delivered under the Plan pursuant to any Award or the exercise thereof shall be subject to such stop transfer orders and other restrictions as the Committee may deem advisable under the Plan or the rules, regulations and other requirements of the Securities and Exchange Commission and any applicable federal or state securities laws, and the Committee may cause a legend or legends to be placed on any such certificates to make appropriate reference to such restrictions. If the Shares or other securities are traded on NASDAQ or a securities exchange, the Company shall not be required to deliver any Shares or other securities covered by an Award unless and until such Shares or other securities have been admitted for trading on NASDAQ or such securities exchange.

Section 7. Amendment and Termination; Adjustments.

Except to the extent prohibited by applicable law and unless otherwise expressly provided in an Award Agreement or in the Plan:

(a) Amendments to the Plan. The Board of Directors of the Company may amend, alter, suspend, discontinue or terminate the Plan; *provided, however,* that, notwithstanding any other provision of the Plan or any Award Agreement, without the approval of the stockholders of the Company, no such amendment, alteration, suspension, discontinuation or termination shall be made that, absent such approval:

(i) would violate the rules or regulations of NASDAQ or any securities exchange that are applicable to the Company; or

(ii) would cause the Company to be unable, under the Code, to grant Incentive Stock Options under the Plan.

(b) Amendments to Awards. The Committee may waive any conditions of or rights of the Company under any outstanding Award, prospectively or retroactively. The Committee may not amend, alter, suspend, discontinue or terminate any outstanding Award, prospectively or retroactively, without the consent of the Participant or holder or beneficiary thereof, except as otherwise herein provided (for clarification purposes, in no event shall the consent of the participant or holder or beneficiary be required in order for the Committee to effectuate a "lock–up").

(c) Correction of Defects, Omissions and Inconsistencies. The Committee may correct any defect, supply any omission or reconcile any inconsistency in the Plan or any Award in the manner and to the extent it shall deem desirable to carry the Plan into effect.

Section 8. Income Tax Withholding; Tax Bonuses.

(a) Withholding. In order to comply with all applicable federal or state income tax laws or regulations, the Company may take such action as it deems appropriate to ensure that all applicable federal or state payroll, withholding, income or other taxes, which are the sole and absolute responsibility of a Participant, are withheld or collected from such Participant. In order to assist a Participant in paying all or a portion of the federal and state taxes to be withheld or collected upon exercise or receipt of (or the lapse of restrictions relating to) an Award, the Committee, in its discretion and subject to such additional terms and conditions as it may adopt, may permit the Participant to satisfy such tax obligation by (i) electing to have the Company withhold a portion of the Shares otherwise to be delivered upon exercise or receipt of (or the lapse of restrictions relating to) such Award with a Fair Market Value equal to the amount of such taxes or (ii) delivering to the Company shares other than Shares issuable upon exercise or receipt of (or the lapse of restrictions relating to) such Award with a Fair Market Value equal to the amount of such taxes.

(b) Tax Bonuses. The Committee, in its discretion, shall have the authority, at the time of grant of any Award under this Plan or at any time thereafter, to approve cash bonuses to designated Participants to be paid upon their exercise or receipt of (or the lapse of restrictions relating to) Awards in order to provide funds to pay all or a portion of federal and state taxes due as a result of such exercise or receipt (or the lapse of such restrictions). The Committee shall have full authority in its discretion to determine the amount of any such tax bonus.

Table of Contents

Section 9. General Provisions

(a) <u>No Rights to Awards</u>. No Key Employee, Participant or other Person shall have any claim to be granted any Award under the Plan, and there is no obligation for uniformity of treatment of Key Employees, Participants or holders or beneficiaries of Awards under the Plan. The terms and conditions of Awards need not be the same with respect to any Participant or with respect to different Participants.

(b) <u>Exchange Programs</u>. For the avoidance of doubt, the Committee, in its sole discretion, may provide for, and the Company may implement, one or more Exchange Programs, pursuant to which certain outstanding awards under any equity incentive plan of the Company, could, at the election of the person holding such Awards, be tendered to the Company for cancellation in exchange for the issuance of Awards under the Plan. The terms and conditions of any Exchange Program pursuant to this Section 9(b) will be determined by the Committee in its sole discretion.

(c) <u>Award Agreements</u>. No Participant will have rights under an Award granted to such Participant unless and until an Award Agreement shall have been duly executed on behalf of the Company.

(d) <u>No Limit on Other Compensation Arrangements</u>. Nothing contained in the Plan shall prevent the Company or any Subsidiary from adopting or continuing in effect other or additional compensation arrangements, and such arrangements may be either generally applicable or applicable only in specific cases.

(e) <u>No Right to Employment</u>. The grant of an Award shall not be construed as giving a Participant the right to be retained in the employ of the Company or any Subsidiary, nor will it affect in any way the right of the Company or a Subsidiary to terminate such employment at any time, with or without cause. In addition, the Company or a Subsidiary may at any time dismiss a Participant from employment free from any liability or any claim under the Plan, unless otherwise expressly provided in the Plan or in any Award Agreement.

(f) <u>Assignability</u>. No Award granted under this Plan, nor any other rights acquired by a Participant under this Plan, shall be assignable or transferable by a Participant, other than by will or the laws of descent and distribution or pursuant to a qualified domestic relations order as defined by the Code, Title I of the Employee Retirement Income Security Act, or the rules promulgated thereunder.

(g) <u>Governing Law</u>. The validity, construction and effect of the Plan or any Award, and any rules and regulations relating to the Plan or any Award, shall be determined in accordance with the laws of the State of Colorado.

(h) <u>Severability</u>. If any provision of the Plan or any Award is or becomes or is deemed to be invalid, illegal or unenforceable in any jurisdiction or would disqualify the Plan or any Award under any law deemed applicable by the Committee, such provision shall be construed or deemed amended to conform to applicable laws, or if it cannot be so construed or deemed amended without, in the determination of the Committee, materially altering the purpose or intent of the Plan or the Award, such provision shall be stricken as to such jurisdiction or Award, and the remainder of the Plan or any such Award shall remain in full force and effect.

(i) <u>No Trust or Fund Created</u>. Neither the Plan nor any Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company or any Subsidiary and a Participant or any other Person. To the extent that any Person acquires a right to receive payments from the Company or any Subsidiary pursuant to an Award, such right shall be no greater than the right of any unsecured general creditor of the Company or any Subsidiary.

(j) <u>No Fractional Shares</u>. No fractional Shares shall be issued or delivered pursuant to the Plan or any Award, and the Committee shall determine whether cash shall be paid in lieu of any fractional Shares or whether such fractional Shares or any rights thereto shall be canceled, terminated or otherwise eliminated.

(k) <u>Transfers and Leaves of Absence</u>. Solely for the purposes of the Plan: (a) a transfer of an employee Participant's employment without an intervening period from the Company to a Subsidiary or vice versa, or from one Subsidiary to another, shall not be deemed a termination of employment, and (b) an employee Participant who is granted in

58

Table of Contents

writing a leave of absence shall be deemed to have remained in the employ of the Company or a Subsidiary, as the case may be, during such leave of absence.

(l) <u>Headings</u>. Headings are given to the Sections and subsections of the Plan solely as a convenience to facilitate reference. Such headings shall not be deemed in any way material or relevant to the construction or interpretation of the Plan or any provision thereof.

(m) <u>Replacement and Substitute Awards</u>. Notwithstanding anything in this Plan to the contrary, any Option or Award that is intended to be a Replacement or Substitute Award granted in connection with the spin–off of the Company shall be subject to the same terms and conditions as the original DISH award to which it relates; provided, however that such awards shall be administered by the Committee. In this regard, all employment with DISH shall be taken into account for purposes of determining the vesting and exercisability provisions of such Options and/or Awards.

Section 10. Effective Date of the Plan.

The Plan shall be effective as of January 1, 2008, subject to approval by the stockholders of the Company on or before that date or within one year thereafter.

Section 11. Term of the Plan.

Unless the Plan shall have been discontinued or terminated as provided in Section 7(a), the Plan shall terminate on January 1, 2018. No Award shall be granted after the termination of the Plan. However, unless otherwise expressly provided in the Plan or in an applicable Award Agreement, any Award theretofore granted may extend beyond the termination of the Plan, and the authority of the Committee provided for hereunder with respect to the Plan and any Awards, and the authority of the Board of Directors of the Company to amend the Plan, shall extend beyond the termination of the Plan.

**Table of Contents**

EXHIBIT A
PERFORMANCE CRITERIA

**Subscribers, subscriber service and subscriber satisfaction:** customers; subscribers; total subscribers; gross subscriber additions; net subscriber additions; subscriber quality; churn subscribers; average subscriber life; ratings; retention; viewership; or similar criteria.

**Employees and employment activities:** attrition; retention; satisfaction; ethics compliance; management effectiveness; workforce diversity; individual executive performance; or similar criteria.

**Revenues, expenses and earnings:** revenues; sales; net revenues; operating costs and expenses; overhead costs; costs of revenues; costs of sales; broadcast programming and other costs; subscriber service expenses; broadcast operations expense; selling, general and administrative expense; subscriber acquisition costs; upgrade and retention costs; general and administrative expenses; depreciation and amortization; operating profit; operating results; operating income; adjusted operating income; operating earnings; operating profit before depreciation and amortization; interest income; interest expense; other income and expense; other, net; income from continuing operations; earnings from continuing operations; income from continuing operations before income taxes and minority interests; income tax expense; minority interests in net earnings of subsidiaries; income from continuing operations before cumulative effect of accounting changes; income from discontinued operations; cumulative effect of accounting changes; net income; adjusted net income; basic or diluted earnings or loss per common share for income or loss from continuing operations before cumulative effect of accounting changes, for income or loss from discontinued operations (net of taxes), for cumulative effect of accounting changes (net of taxes), or for net income or loss; dividends paid; or similar criteria.

**Financial metrics:** cash; cash on hand; cash balance; cash equivalents; cash and cash equivalents; cash and short term investments; cash flow; operating cash flows; adjusted operating cash flows; cash from operations; investing cash flows; financing cash flows; free cash flow; free cash flow before net cash paid for interest and taxes; cash flow before or after operating activities, investing activities, financing activities or discontinued operations; capital expenditures; cash paid for property, equipment, satellites, and/or leased set top receivers; proceeds from dispositions of businesses, assets, or other investments; average revenue per unit (ARPU); unit acquisition costs (SAC) per gross unit addition; average cost per unit (ACPU); average margin per unit (AMPU); pre–SAC margin; operating profit margin; operating margin; profit margin; net income margin; bad debt percentage; earnings per share; adjusted earnings per share; return on assets; adjusted return on assets; return on average assets; return in excess of cost of capital; return on equity; return on net assets; return on investment; return on net investment; return on average equity; adjusted return on equity; cash flow return on investment (discounted or otherwise); cash flow return on capital; cash flow in excess of cost of capital; cash flow return on tangible capital; contribution margin; debt to capital ratio; debt to equity ratio; net present value; internal rate of return; profit in excess of cost of capital; return on capital; return on net or average assets, equity or capital; return on shareholders' equity; return on invested capital; return on investors' capital; return on operating revenue; return on total capital; risk–adjusted return on capital; total equity ratio; total shareholder return; cost of goods sold; accounts receivable; unit sales; or similar criteria.

**Stock price:** share price; share price growth or appreciation; share price growth or appreciation in comparison with industry or market indices; shareholder value; shareholder value growth or appreciation; total market capitalization; total market capitalization growth or appreciation; total market value; total market value growth or appreciation; or similar criteria.

**Other performance measures:** acquisitions or divestitures of subsidiaries, affiliates and joint ventures; control of expenses; corporate values; economic value added (EVA); environment; facilities utilization; implementation or completion of critical projects; installations; market expansion; market penetration; market share; number of channels broadcast in standard and/or high definition on a national and/or local basis; network upgrades; operating performance; penetration rates; installation and service work order completion; closed, rescheduled or similar performance or productivity rates; number of service calls; availability rates; hardware recovery; hardware refurbishment or redeployment; hardware performance; average subscriber service phone call times; number of subscriber service phone calls received; service level; performance relative to budget, forecast or market expectations; performance standards relevant to our business, product or service; safety; shareholder value added; strategic business criteria based on meeting specified product development, strategic partnering, research and development, market penetration or geographic business expansion goals; value added; website visits; website advertising; intellectual property (e.g., patents); satellite utilization or similar criteria.

60